# IN THE SUPREME COURT OF TEXAS

No. 19-0234

LaDonna Degan, Ric Terrones, John McGuire, Reed Higgins, Mike Gurley, Larry Eddington, and Steven McBride, Appellants,

v.

The Board of Trustees of the Dallas Police and Fire Pension System, Appellee

On Certified Questions from the
United States Court of Appeals for the Fifth Circuit

**Argued September 17, 2019**

Justice Devine delivered the opinion of the Court, in which Chief Justice Hecht, Justice Lehrmann, Justice Blacklock, Justice Busby, and Justice Bland joined.

Justice Boyd filed a dissenting opinion, in which Justice Green joined.

Justice Guzman did not participate in the decision.

In this case, we consider two questions of Texas law certified from the United States Court of Appeals for the Fifth Circuit. Such questions are authorized by our Constitution and provided for in our appellate rules. Tex. Const. art. V, § 3-c; Tex. R. App. P. 58. The questions concern whether changes made by the Texas Legislature in 2017 to Deferred Retirement Option Plans violate a state constitutional provision that prohibits the reduction or impairment of certain accrued

retirement benefits. *See* TEX. CONST. art. XVI, § 66. We consider the certified questions below and conclude that the 2017 legislative reforms here do not violate the Constitution.

I

The Dallas Police and Fire Pension System is a public pension fund that provides comprehensive retirement, death, and disability benefits for approximately 9,300 active and retired City of Dallas police officers, firefighters, and their qualified survivors. Like many states, the State of Texas has created a series of defined benefit plans for government employees. Pension systems for police and firefighters in cities like Dallas are largely controlled by the Texas Legislature through Article 6243a-1. *See* TEX. REV. CIV. STAT. ANN. art. 6243a-1 (Supp. 2019). Under that statute, a local Board of Trustees, selected by the mayor in consultation with the city council and by the members and pensioners of the pension system, administers the pension system under a compliant plan document. *Id.* art. 6243a-1, § 3.01(a), (b).

Under the plan, individuals become members of the pension system once they commence training at the police or firefighter academy. The member and the city contribute to the member's account during the member's active service. Section 6 of the plan enumerates four general categories of benefits: "retirement pension" options, "disability benefits," "death benefits," and a "Deferred Retirement Option Plan" (commonly referred to by its initials DROP). *See generally id.* art. 6243a-1, §§ 6.01–.14. The pension system began offering DROP accounts in 1993 as an incentive to retain experienced police officers and firefighters after they attained eligibility to retire.

Before DROP's existence, an active police officer or firefighter who became eligible to retire had two options under the pension system: The member could remain on the job and continue to

2

grow his or her pension under the system's pension formula, or the member could retire and begin drawing his or her accrued pension in the form of a monthly annuity payment. DROP introduced a third option: A member could freeze his or her retirement benefit and continue working, receiving both a salary and an annuity payment from his or her retirement account.

While the member electing DROP continues on the job, the monthly annuity is paid into the member's DROP account. Once the member has left active service, future annuity payments are redirected to the member, who is also now eligible to withdraw funds from his or her DROP account. DROP accounts initially collected an attractive interest rate and provided the member several options for withdrawing these funds at the end of active service. Under these options, the member could elect a lump-sum distribution, an annuity based on the member's life expectancy, or disbursement based on monthly or annual payments designated by the member. *See* Act of June 18, 1993, 73rd Leg., R.S., ch. 872, § 1, 1993 Tex. Gen. Laws 3432, 3465–66 (formerly TEX. REV. CIV. STAT. ANN. art. 6243a-1, § 6.14(d)(1)–(3) (1993)).

DROP accounts became very popular. Eventually, the amount of money drawn into these accounts, together with a member's right to elect a lump-sum distribution on leaving active service, threatened the liquidity and stability of the pension system. These concerns, in turn, motivated the Legislature to pass House Bill 3158 in 2017. This Bill amended the applicable pension statute to eliminate lump-sum payments and to permit only the annuitized option for DROP account withdrawals. TEX. REV. CIV. STAT. ANN. art. 6243a-1, § 6.14(e); *see* Act of May 31, 2017, 85th Leg., R.S., ch. 318, § 1.42, 2017 Tex. Gen. Laws 639, 696 (H.B. 3158) (amending TEX. REV. CIV. STAT. ANN. art. 6243a-1).

In the underlying litigation, seven Dallas System retirees (the "Retirees") challenge as unconstitutional the 2017 statutory amendments, which eliminate their ability to request lump-sum distributions from their respective DROP accounts. The Retirees contend that the funds in DROP are accrued service retirement benefits and that the change to how these funds may be withdrawn effectively reduces or impairs the accrued benefit in violation of the Texas Constitution, article XVI, section 66(d). That provision prohibits changes that reduce or impair certain accrued benefits, stating that:

> (d) On or after the effective date of this section, a change in service or disability retirement benefits or death benefits of a retirement system may not reduce or otherwise impair benefits accrued by a person if the person:
>
> > (1) could have terminated employment or has terminated employment before the effective date of the change; and
> >
> > (2) would have been eligible for those benefits, without accumulating additional service under the retirement system, on any date on or after the effective date of the change had the change not occurred.

TEX. CONST. art. XVI, § 66.

Concluding that Section 66's application here was unsettled under Texas law, the Fifth Circuit certified the following questions to this Court:

> 1. Whether the method of withdrawal of funds from Deferred Retirement Option Plan is a service retirement benefit protected under article XVI, section 66 of the Texas Constitution.
>
> 2. If the answer to Question 1 is "yes," then whether the Board of the Dallas Police and Fire Pension's System's decision, pursuant to the Texas statute in question, to alter previous withdrawal elections and annuitize the DROP funds over the respective life expectancy of the Plaintiffs violates Section 66 of the Texas Constitution.

*Degan v. Bd. of Trs. of Dall. Police & Fire Pension Sys.*, 766 Fed. Appx. 16, 20 (5th Cir. 2019) (per curiam). The Circuit's opinion further summarizes the parties' constitutional disagreement to be "whether DROP accounts are 'service retirement benefits' (and therefore protected by Section 66) and whether the DROP withdrawal change reduces or impairs the benefit (and therefore prohibited by Section 66)." *Id.* at 18.

II

The Circuit's first question recognizes that Section 66 protects from reduction or impairment only certain kinds of benefits. For example, it does not apply to health benefits, life insurance benefits, or to some disability benefits. TEX. CONST. art. XVI, § 66(c). And while the constitutional protection expressly applies to service retirement benefits, *id.* § 66(d), the Circuit's opinion notes a disagreement "about whether DROP accounts are 'service retirement benefits.'" 766 Fed. Appx. at 18. The first certified question nevertheless assumes that DROP is a service retirement benefit by inquiring whether the method of withdrawal of funds from DROP is itself a benefit protected by the Constitution. As usual, the Circuit disclaims any intention or desire that we confine our reply to the precise form or scope of the questions certified. *Id*. at 20. Because of the acknowledged disagreement, we begin with whether DROP is a service retirement benefit as the first question assumes.

The Retirees submit that a DROP account must be a service retirement benefit under our reasoning in *Eddington v. Dallas Police & Fire Pension System*, ___ S.W.3d ___ (Tex. 2019); 2019 WL 1090799 (Tex. Mar. 8, 2019). There, we noted that, contextually, Section 66 recognizes a pensioner's annuity payments as a protected service retirement benefit. *Id*. at ___; 2019 WL

5

1090799, at *5. Because a DROP account consists of a collection of these annuity payments and accrued interest in what we have previously described as a "forced savings account," it logically follows that the funds in that account are likewise a service retirement benefit. *Id*. at ___; 2019 WL 1090799, at *1.

That conclusion finds further support in the text of the constitutional provision and underlying statute. Section 66 expressly excludes certain types of benefits, but DROP is not among those excluded. *See* TEX. CONST. art. XVI, § 66(c). Moreover, all of the "Benefits" available under the system's pension plan are listed in section 6 of the plan and underlying statute, and DROP is enumerated as a benefit in the same manner as the others. *See* TEX. REV. CIV. STAT. ANN. art. 6243a-1, § 6.14. We therefore agree that the funds deposited in the DROP account (and accrued interest) are a service retirement benefit to which the protection afforded by Section 66 may apply.

Although the parties have previously taken contrary positions on DROP's status as a service retirement benefit for purposes of Section 66, they agree in this Court that the method of withdrawing funds from DROP is not itself a service retirement benefit. During argument, the Retirees conceded as much, agreeing that our answer to the first question, as phrased, should be no. The parties, however, have different views on the consequences that flow from that negative answer.

The Board contends that a negative answer to the first question ends the task certified to us by the Circuit. The Retirees respond that it does not end our inquiry because the retirement service benefits at issue here are the funds in their DROP accounts, and the constitutional question is whether the changes restricting their access to these funds is a prohibited reduction or impairment to that underlying benefit. We agree that this is the appropriate issue and that it is generally captured

6

in the second certified question, which asks whether the Board's "decision, pursuant to the Texas statute in question, to alter previous withdrawal elections and annuitize the DROP funds over the respective life expectancy of the Plaintiffs violates Section 66 of the Texas Constitution." 766 Fed. Appx. at 20. We turn, then, to the Constitution's application to that question.

III

Our guiding principle when interpreting the Texas Constitution is to give effect to the intent of the voters who adopted it. *Cox v. Robison*, 150 S.W. 1149, 1151 (Tex. 1912). We presume that the framers carefully chose the language, and we interpret their words accordingly. *Leander Indep. Sch. Dist. v. Cedar Park Water Supply Corp.*, 479 S.W.2d 908, 912 (Tex. 1972). In determining the intent of the framers and adopters of a constitutional proposition, we may consider contextual factors such as "the history of the legislation, the conditions and spirit of the times, the prevailing sentiments of the people, the evils intended to be remedied, and the good to be accomplished." *Harris Cty. Hosp. Dist. v. Tomball Reg'l Hosp.*, 283 S.W.3d 838, 842 (Tex. 2009) (internal citation omitted).

The history of Section 66 indicates that its impetus was a Depression-era decision from this Court that subordinated the pension rights of public servants to the authority of the state to diminish or abolish future pension payments. *See City of Dall. v. Trammell*, 101 S.W.2d 1009, 1017 (Tex. 1937) (holding that a "pensioner has no vested right" to future pension payments). In *Trammell*, the Court considered whether a public employee, after retirement, had "a vested right to participate in the pension fund to the extent of the full amount of monthly installments granted to him at retirement." *Id.* at 1011. At issue was whether that monthly amount could be reduced.

7

Exemplifying Texas's historical view of public pensions as a "gratuity," the Court held that a pensioner had no vested right to future pension installments and, therefore, the Legislature could reduce accrued benefits or abolish the pension system altogether. *Id.* at 1013, 1017.

Section 66 directly responds to that holding as a 2008 Texas Attorney General opinion explains:

> The effect the Legislature—the makers—intended in adopting House Joint Resolution 54 . . . proposing the constitutional amendment was to insure that retirement benefits (the monthly pension payments) of vested municipal employees would not be reduced or impaired by subsequent, unilateral legislative action.

Tex. Att'y Gen. Op. No. GA-0615 (2008). Legislative history thus confirms that Section 66 was added to the Constitution to overrule our decision in *Trammell* by protecting the amount of monthly pension payments from reduction or impairment through subsequent changes to the system. TEX. CONST. art. XVI, § 66; *see also Van Houten v. City of Fort Worth*, 827 F.3d 530, 537–38 (5th Cir. 2016) ("Section 66 reverses the core unfairness of the *Trammell* decision by ensuring that earned benefits cannot be reduced.").

Both the Fifth Circuit and this Court have previously considered the protection afforded by Section 66. In *Van Houten*, the Fifth Circuit considered whether Section 66(d) prohibited pension reforms designed to decrease expected, but as-yet unearned, benefits. 827 F.3d at 534. The employees who objected to the reforms argued that the formula used to calculate the benefit vested and became constitutionally protected, along with the benefit, when the employee reached retirement age. *Id.* at 535. Thus, in the employees' view, Section 66 foreclosed even wholly prospective formula adjustments. *Id.* The Circuit disagreed. It concluded that, in the context of the

8

constitutional provision, "benefits" refers to payments but does not encompass the formula by which those payments are calculated. *See id*. at 535–37 (discussing the "numerous indications that the term 'benefits' refers only to payments"). As the Fifth Circuit observed, "Section 66(d) prohibits the impairment of *accrued* benefits for *vested* employees." *Id*. at 534 (emphasis in original). Thus, the pension reform that altered the rate at which future benefits accrued did not violate the constitutional provision.

Later, our decision in *Eddington* agreed with *Van Houten*'s contextual understanding of the term "benefit" as referring to the pension's annuity payments and not the formula by which those payments are calculated. *Eddington*, ___ S.W.3d at ___; 2019 WL 1090799, at *5. We further agreed "that 'accrued' benefits under Section 66(d) are those that have been earned by service, not those that may be earned by future service." *Id*. at ___; 2019 WL 1090799, at *4 (citing *Van Houten*, 827 F.3d at 535). Pensioners in that case contended that Section 66 prohibited the pension system from reducing the interest rate paid on their DROP accounts. We did not agree that the change invoked Section 66's protection because the interest-rate reduction applied prospectively and therefore did not affect accrued benefits. *Id*. at ___; 2019 WL 1090799, at *1.

The Circuit suggests the issue here is much closer because the statutory reform introduced by House Bill 3158 "seems to retroactively nullify a retiree's election about" payment from a DROP account and "seems to relate to . . . previously accrued or granted benefits." 766 Fed. Appx. at 19. The Retirees similarly argue that the change here does not apply prospectively to the accrued benefits in their DROP accounts, as was the case of the interest-rate reduction in *Eddington*, but rather has a retrospective impact on those funds. Before the change, the Retirees ostensibly

9

controlled the rate at which they could draw funds from their DROP accounts. They could elect to withdraw the funds as a single-sum distribution, as a monthly annuity based on the member's life, or in substantially equal monthly or annual payments designated by the member. *See* Act of June 18, 1993, 73rd Leg., R.S., ch. 872, § 1, 1993 Tex. Gen. Laws 3432, 3465–66 (formerly TEX. REV. CIV. STAT. ANN. art. 6243a-1, § 6.14(d)(1)–(3) (1993)). The 2017 amendment to the statute (H.B. 3158) eliminated all but the monthly annuity option for distributing DROP funds. *See* TEX. REV. CIV. STAT. ANN. art. 6243a-1, § 6.14(e). The Retirees complain that this change violates Section 66 by retroactively voiding previous elections and effectively denying them access to their accrued benefits. They essentially contend that the funds in their DROP accounts have been reduced or impaired because the Retirees no longer have unfettered access to them.

But the reform here does not negatively affect the amount of money in the Retirees' DROP accounts. The monthly annuity payments and earned interest collected in those accounts are neither reduced nor impaired. Only the rate at which the Retiree is permitted to withdraw these funds is affected. While an outright denial of access to these funds might reasonably be considered an impairment, the complaint here is that the pensioner's choices about access have been impaired by the statutory reform that eliminates two of the three previous methods of distribution. The Dissent characterizes the statutory choice under former law as a property right that attaches to DROP funds as they accumulate, and, as such, a right entitled to protection under Section 66. *Post* at ___. But *Eddington* distinguishes between pension annuity payments and plan terms, observing that nothing in Section 66's text "suggests that all retirement plan terms are protected benefits" and rejecting the general notion that DROP is "a contract between the System and a member that cannot be changed."

10

*Eddington,* ___ S.W.3d at ___; 2019 WL 1090799, at \*4–\*5.  The legislative history, moreover, bears this out.  *See, e.g.*, House Comm. on Pensions & Invs., Bill Analysis, Tex. H.J. Res. 54, 78th Leg., R.S. (2003) (deleting language in earlier version of Section 66 stating that "membership in such a  plan is a contractual relationship").  Instead of a strict contractual regime, Texas chose a more flexible approach allowing for prospective changes to benefits not yet granted.  *See* Tex. Leg. Council, Analyses of Proposed Constitutional Amendments, Sept. 13, 2003 Election, at 101 (July 2003) (noting that Section 66 allows prospective changes to "adjust retirement benefits if necessary to respond to changing economic times") [hereafter "Legislative Analyses"], *available* at https://tlc.texas.gov/docs/amendments/analyses03.pdf.

The constitutional complaint here is similar to the one rejected by the Fifth Circuit in *Van Houten*.  There, the employees argued that Section 66 prohibited changes to the benefit formula after vesting in the plan—that is, after the employee became eligible to retire.  The Circuit rejected the notion that the formula also vested at that time, "meaning that even wholly prospective formula adjustments are foreclosed by Section 66."  *Van Houten*, 827 F.3d at 535.  The Circuit further rejected a 2008 Texas Attorney General Opinion construing Section 66(d) to "prohibit[] a change in the method of determining the compensation base of vested employees if such action reduces or impairs retirement benefits that the employee would have been eligible to receive on or before the effective date of the change." Tex. Att'y Gen. Op. No. GA-0615, at 11.  "The Circuit disagreed with the opinion's analysis, noting that, after finding Section 66's text and legislative history unhelpful, the opinion based its ultimate holding on 'other state supreme courts, particularly those of New York, Illinois, and Alaska.'" *Eddington*, ___ S.W.3d at ___; 2019 WL 1090799, at \*4 (citing *Van*

11

*Houten*, 827 F.2d at 536). "It was problematic, the Circuit noted, to assume that Texas had suddenly decided to copy these states, particularly with respect to public pension protection [an area in which Texas was known to be an outlier]." *Id*. (citing *Van Houten*, 827 F.2d at 537). Indeed, Section 66 strikes a careful constitutional balance, granting "those retirement systems the flexibility the systems need to adjust retirement benefits if necessary to respond to changing economic times, while still protecting the benefits that local government employees have already earned." Legislative Analyses at 101.

Although not bound by the *Van Houten* decision, we nevertheless noted our agreement with the Circuit's analysis of the constitutional text. *Eddington*, ___ S.W.3d at ___; 2019 WL 1090799, at *4. Thus, *Eddington* similarly construed the term "'benefits'" in Section 66 as "'refer[ring] to payments[,]'" and the protected payments as "the pensioner's annuity payments." *Id*. at ___; 2019 WL 1090799, at *5 (quoting *Van Houten*, 827 F.3d at 535).

The Board argues that, in contrast to the payments protected under Section 66, the Retirees' claim here seeks to constitutionalize a lump-sum method of withdrawing DROP funds. The Board maintains that such a method is simply a plan term that determines how DROP funds are distributed and, like other plan terms, is subject to change. The Board concludes that Section 66 protects only monthly pension annuity payments and not the methodology for DROP withdrawals, and thus does not apply to the change at issue here. But labeling the change as a mere methodology or plan term does not directly address the constitutional question. The changes determined to be constitutional in *Van Houten* and *Eddington* were so, not because they were terms or methodologies, but because they did not reduce or impair an accrued benefit. Had the benefit formula in *Van Houten* or the

12

interest rate reduction in *Eddington* been applied retroactively to reduce an accrued benefit, the constitutional protection would have plainly been invoked. But the pension reforms in those cases did not negatively adjust prior accruals or take back earned interest and thus did not implicate Section 66.

The question of this reform's retroactive effect is more nuanced, however. The underlying statute previously permitted a DROP participant to elect one of three alternative methods of distribution from the fund—an election that, under the statute, could be changed at any time before the participant left active service. *See* Act of June 18, 1993, 73rd Leg., R.S., ch. 872, § 1, 1993 Tex. Gen. Laws 3432, 3465–66 (formerly TEX. REV. CIV. STAT. ANN. art. 6243a-1, § 6.14(d), (f) (1993)). Thus, the change is retrospective in the sense that previous elections about how the DROP participant anticipated having the funds distributed are superseded by the statutory amendment mandating monthly annuity payments. But does that change implicate Section 66 by reducing or impairing the accrued benefit? The Retirees argue that it does because their election to take a lump-sum distribution has a greater net value to them than the annuity that replaces it under the pension reform. Even assuming that to be true, we fail to see how the benefits in their respective accounts have been reduced or impaired by the elimination of this election or the flexibility it provided under former law.

In *Eddington*, we observed once again that issues of constitutional construction may include "a provision's history, the conditions and spirit of the times in which it was adopted, the prevailing sentiments of the people who framed and adopted it, the evils intended to be remedied, and the good to be accomplished." *Eddington*, ___ S.W.3d at ___; 2019 WL 1090799, at *5 (internal quotation

13

marks omitted). Without question, Section 66's purpose was to overrule our Depression-era decision in *Trammell*. As the Fifth Circuit has observed, "Section 66 reverses the core unfairness of the *Trammell* decision by ensuring that earned benefits cannot be reduced." *Van Houten*, 827 F.3d at 537–38. But unlike *Trammell*, the change here does not take away an accrued or granted annuity payment. And like *Eddington*, the reforms here do not affect the Retirees' non-DROP monthly pension annuity payments or the dollar amount of the funds previously credited to DROP. *Eddington*, ___S.W.3d at ___; 2019 WL 1090799, at *5. Moreover, the reform at issue does not retroactively reverse lump-sum distributions already paid out under former law; it merely changes the method of withdrawal going forward by requiring the pension system to distribute all DROP funds with interest in the form of an annuity.

* * *

Under the Texas Constitution, the pension system must be managed according to sound actuarial principles for the benefit of its membership. TEX. CONST. art. XVI, § 67(a). The Government Code further imposes a duty on the Board of Trustees to hold pension system assets in trust for the benefit of all participants, which includes "the members and retirees of the system and their beneficiaries." TEX. GOV. CODE § 802.201. Separate from the Board's ministerial duty to hold these assets in trust is its obligation to manage the pension system according to sound actuarial principles that do not reduce or otherwise impair constitutionally protected benefits. TEX. CONST. art. XVI, §§ 66(f), 67(a).

While Section 66 modifies Texas's former "gratuity" approach to pension benefits for non-statewide plans by protecting some benefits, Section 66 does not prohibit prospective pension

reforms. *See Van Houten*, 827 F.3d 538 (noting Texas's "long-held flexible approach permitting municipalities to revise their pension plans in light of changing economic conditions"). It does, however, prohibit the reduction or impairment of an accrued service retirement benefit, which we have interpreted as protection for the pensioner's vested annuity payments. A pension reform that abandons a more flexible distribution scheme—a scheme that allowed the pensioner to elect how the accrued benefits would be paid over time—in favor of a more predictable scheme—one that preserves access through a vested annuity—does not violate the constitutional prohibition.

We therefore conclude that House Bill 3158, the 2017 amendment to Article 6243a-1, does not violate Article XVI, Section 66 of the Texas Constitution. Our answer to both certified questions is no.

_____
John P. Devine
Justice

Opinion Delivered: January 31, 2020

15